**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

MILICENT J. DANIELS-CHAMBLE          :

                                     :

v.                                   Civil Action WMN-00-3405

                                     :

BALTIMORE LIFE COMPANIES,
    et al.                           :

## MEMORANDUM

Before the Court is Defendant Baltimore Life Companies,

Inc.'s (Baltimore Life's) Motion for Summary Judgment.  Paper No.

34.[1]  The motion is fully briefed.  Upon a review of the

pleadings and the applicable case law, the Court determines that

no hearing is necessary (Local Rule 105.6) and that the motion

will be granted.

Plaintiff, an African-American female, was employed as an

Assistant Vice President for Defendant Baltimore Life beginning

in January 1998.  In March of 1999, Baltimore Life's Chief

Underwriter resigned, and Plaintiff was appointed to serve as the

Acting Chief Underwriter.  Baltimore Life also began searching

for a permanent Chief Underwriter.  Although Plaintiff was

---

[1] Baltimore Life also filed a motion to dismiss based upon
Plaintiff's failure to cooperate with discovery.  Paper No. 25.
This motion presents a repeated pattern on the part of Plaintiff of
disregarding discovery obligations, and then asserting that she did
not receive the pleading or telephone call that would have alerted
her to that obligation.  As a sanction, Baltimore Life seeks
dismissal of the entire action.  While the Court is distressed by
Plaintiff's apparent flaunting of the Court's rules and scheduling
order, it need not resolve this motion as the Court finds that
Baltimore Life is entitled to judgment on the merits.  The motion
to dismiss will be denied as moot.

considered for the position, it was ultimately given to Michael
Muller, a white male hired from outside of the company.  After
she was denied the Chief Underwriter position, Plaintiff
resigned.

In her complaint, Plaintiff, proceeding pro se, alleged that
Baltimore Life's failure to place her in the Chief Underwriter
position was based on her race and sex, in violation of Title VII
of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5, et seq.
She also brought claims of discriminatory discharge and
retaliation, as well as a libel claim related to an e-mail that
was sent by her immediate supervisor concerning her resignation.
On January 16, 2002, this Court issued a memorandum and order
dismissing all but Plaintiff's failure to promote claim.
Defendant now moves for summary judgment as to that remaining
claim.

Plaintiff has offered no direct evidence that the decision
not to offer her the Chief Underwriter position was
discriminatorily motivated.  In the absence of direct evidence,
courts have allowed plaintiffs alleging discriminatory employment
practices to employ the indirect, burden-shifting method of proof
developed in McDonnell Douglas Corp. v. Green, 411 U.S. 792
(1973).  Under the McDonnell Douglas proof scheme, the plaintiff
has the initial burden of proving a prima facie case of
discrimination by a preponderance of the evidence.  To establish

2

a prima facie case in this context, Plaintiff must establish that: 1) she is a member of a protected class; 2) she applied for the position in question; 3) she was qualified for the position, and 4) she was rejected for the position under circumstances giving rise to an inference of unlawful discrimination. Carter v. Ball, 33 F.3d 450, 458 (4th Cir. 1994).

If the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory explanation which, if believed by the trier of fact, would support the conclusion that unlawful discrimination was not the cause of the adverse employment action. See Mitchell v. Data General, 12 F.3d 1310 (4th Cir. 1993). If the defendant meets this burden of production, the presumption created by the prima facie case "drops out of the picture," and the plaintiff bears the ultimate burden of proving that she has been the victim of intentional discrimination. Id.

There is no real dispute that Plaintiff can establish a prima facie case. As an African-American woman, Plaintiff is a member of a protected group. It is undisputed that she applied for the Chief Underwriter position, and that she was generally qualified for that position. Baltimore Life acknowledges that she was being seriously considered. In fact, she was the only employee of Baltimore Life to be so considered. Finally, to establish "circumstances giving rise to an inference of unlawful

3

discrimination," Plaintiff need only offer evidence that the position was ultimately filled by a person outside of her protected group, in this case, a white male. See Carter, 33 F.3d at 458. This, she has done.

The Court finds, however, that the undisputed evidence also establishes that Baltimore Life had a legitimate non-discriminatory reason for hiring Muller over Plaintiff. In the view of the individual charged with making that decision, Brian Stricker, Muller was simply better qualified.

The case law is clear that it is only the ultimate decision maker's perception of the potential candidates that is relevant in determining whether there has been discrimination. Rowe v. Marley Co., 233 F.3d 825, 831 (4th Cir. 2000). A plaintiff's own assessment of her skills, abilities, and qualifications are irrelevant. Bernstein v. The St. Paul Companies, Inc. 134 F.Supp.2d 730, 739 (D. Md. 2001). Courts are also cautioned not to sit as a "super personnel department," second-guessing or substituting its own judgment over that of the decision maker. Langerman v. Thompson, 155 F.Supp.2d 490, 499 (D. Md. 2001); see also McCain v. Waste Management, Inc., 115 F.Supp.2d 568, 574-75 (D. Md. 2000).

It is undisputed that Stricker was the sole individual responsible for filling the Chief Underwriter position. Stricker stated in his affidavit that, although he was "favorably

4

impressed" with Plaintiff, he "believed that she was relatively
inexperienced as an executive level underwriter."  Stricker Aff.
at ¶ 21.  He noted that Muller "had some 20 years more
underwriting experience than Plaintiff" and had been serving as
the Chief Underwriter for another major insurance company for the
past five years.  Id. at ¶ 22.  Also attached to his affidavit is
a side by side comparison of the two candidates that he prepared
in which he rated Muller above Plaintiff in every single category
outlined in the position description.  See id., Exh. F
("Baltimore Life Chief Underwriter, Sketch of Duties and
Responsibilities").  This comparison of experience and skills
would have been enough to select Muller over Plaintiff, but
Stricker also indicates that his decision was guided by concerns
he had about Plaintiff's interpersonal style.  While Plaintiff
challenges the significance and veracity of the comments, it is
undisputed that several of those who worked with her stated that
they found her not to be approachable or personable.

     Plaintiff's response to Baltimore Life's proffered non-
discriminatory reason for selecting Muller over her focuses
primarily on her belief that she was well qualified for the
position.  That she was qualified for the position, however, was
never in dispute.  The issue was which candidate was better
qualified.  The only area in which Plaintiff specifically claims
to be better qualified than Muller relates to some insurance

                                5

industry designations that she had obtained and some continuing education course work that she had taken that Muller had not. See Opp. at 16. Baltimore Life responds that these courses and designations are of little importance for the Chief Underwriter's position. Plaintiff herself states that some of the classes she listed were intended to be taken by the clerical staff to meet "minimum skill requirements" and that she took them "so that she could lead by example and encourage the team members to pursue available educational opportunities." Opp. at 16.

Plaintiff raises one additional argument that merits brief mention, if only to illustrate how far Plaintiff had to reach in attempting to support her claim. This argument relates to some executive coaching services that Baltimore Life provided for her around the same time that she began serving as Acting Chief Underwriter. According to Baltimore Life's Director of Human Resources, these one-on-one executive coaching services were "an expensive benefit that Baltimore Life provides to only those employees who are considered to be important assets to the organization and whom it believes are 'the future of the company.'" Aff. of Rosalind McElrath at ¶ 5. Plaintiff attempts to attribute a nefarious motive to Baltimore Life's provision of these services, claiming that "Plaintiff was hired an Executive Coach so that [Baltimore Life] would have an excellent forum from which they could spread all of the stereotypes necessary to

6

prevent the Plaintiff from being selected as the Chief
Underwriter." Opp. at 14. The attribution of this motive was
premised on Plaintiff's belief that "[o]nly an African American
female warranted such special treatment all under the guise of
being the "future of the Company." Id. At 13.

Plaintiff's theory is not only highly implausible, it is not
supported by the record. First, the executive coaching was first
recommended by Mark Ewing, who was Plaintiff's supervisor at the
time. The record demonstrates that Ewing was one of Plaintiff's
strongest supporters within Baltimore Life, and was a strong
advocate for her to be considered for the Chief Underwriter
position. Stricker Aff. at ¶ 11. Furthermore, Plaintiff is
incorrect that the tutoring was only provided for her. Two white
males, and a white female were also sent to executive coaching.
McElrath Supp. Aff. at ¶ 12.

In light of all of the above, the Court finds that
Plaintiff's evidence falls short of that needed to overcome
Baltimore Life's motion for summary judgment and that the motion
should be granted. A separate order consistent with this
memorandum will issue.

William M. Nickerson
Senior United States District Judge

Dated: February /2 , 2003

7